Filed 8/15/16  In re Bella V. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re BELLA V., a Person Coming Under the Juvenile Court Law. | B268754 |
| | (Los Angeles County Super. Ct. No. DK12693) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. SANDRA T., et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Philip Soto, Judge.  Reversed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant Sandra T.

Linda B. Puertas and the Law Office of Linda B. Puertas, under appointment by the Court of Appeal, for Defendant and Appellant Jose V.

Mary C. Wickham, County Counsel, D. Keith Davis, Assistant County Counsel, and Jeanette Cauble, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Jose V. (father) and Sandra T. (mother) appeal the juvenile court's jurisdictional order finding that they each had a marijuana abuse problem that rendered them incapable of providing regular care for their five-year-old daughter Bella V. The parents contend there was insufficient evidence to support the court's finding that they used marijuana in an abusive manner. We agree, and reverse the order.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Referral and Detention*

#### 1. *Events preceding the section 300 petition*

Mother and father are the parents of Bella V., who was born in November of 2010. On June 15, 2015, the Los Angeles County Department of Children and Family Services (DCFS) received a referral "alleging general neglect by parents." The caller claimed father was smoking marijuana with other adults inside the family residence, and that the smoking occurred "all day and every day while the child is in the home with them." The caller also alleged there was "constantly a very strong odor of marijuana coming from the home . . . that reaches the front sidewalk area."

A DCFS social worker visited the home, which she found to be in "fair" condition. The social worker "did not note any odor that would suggest recent marijuana use in the house." She did, however, "observe some ashes on the coffee table, a lighter on the floor, and a glass bong on a different coffee table against the wall." The social worker spoke privately with father, who was "cooperative and willing to discuss" the case. Father stated that he smoked marijuana "almost every day approximately one to two times per day." He explained that he did not smoke inside the home, and normally used the drug "after work or right after bed." Father further explained that he had a medicinal marijuana card, which he showed to the social worker, and that he used the drug to relieve pain in his hand and his back, and to help him sleep.

In response to questions regarding the presence of the glass bong and ashes found inside the home, father stated that he normally brought the device inside "before and after smoking," and that the ashes were from "cleaning the bong out." After the social worker

2

informed father it was unsafe to have these items in an area that was accessible to the child, father said he "understood," and would put the pipe in a secure place.

Father reported that mother had moved into the home with Bella two weeks earlier. When asked who supervised Bella while father was at work or using marijuana, he said "usually [Bella's] mother," noting that Bella's maternal grandmother, who lived next door, also helped supervise the child. Father also said he "typically use[d] when [the child] [wa]s asleep or not home," and that he and mother "did not smoke at the same time." Father stated that a total of eight people "live[d] in th[e] apartment," which included "close friends of the family." Father asserted they "did not usually smoke together as it is not intended to be a gathering or party." Father denied drinking alcohol, or having ever engaged in any form of domestic violence or abuse. Father said he was the "financial provider" for the family, currently employed full time as a cook.

The social worker then spoke with mother, who confirmed that she and Bella had moved in with father two weeks earlier. They had previously lived with the maternal grandmother. Mother stated that father only smoked outside the house, and that she had previously instructed him to keep the glass pipe outside. Mother said she attended vocational school from 5:00 p.m. to 10:00 p.m. each night, explaining that both of Bella's grandmothers helped father care for the child when mother was not home. In regards to her own drug use, mother said she used marijuana "drops right before she goes to sleep as a sleep aid because she suffers from insomnia." Mother denied using any other drugs, and denied any domestic violence in the home. Mother stated that Bella's "well-being [was] her priority."

The social worker also spoke with Bella, who appeared "clean" and "well groomed," and displayed no "marks of abuse." According to the social worker, Bella had a "friendly disposition and talked openly." The child stated that she felt "safe with [parents]," and slept on their bed when she felt afraid of the dark. Bella said she had never seen the parents smoke inside the house, explaining that they always smoked outside so that she would not get sick. Bella also said her parents kept her safe, and that the other people who lived in the apartment were kind.

3

The following day, the parents traveled to DCFS to "discuss an appropriate plan" to ensure they were never "both under the influence while caring for [Bella]." The social worker suggested the parents ask the maternal grandmother to stay with the family on nights when they were both using the drug. Father, however, stated "he would rather have a plan with mother that they cannot use [the drug] at the same time." The parents agreed to take a drug test the next day. Both tests were positive for marijuana. Mother's test showed a THC (the active ingredient in marijuana) concentration level of 696 nanograms per milliliter (ng/ml), and father's test showed a THC concentration of 395 ng/ml. Neither parent tested positive for any other substance.

On June 29, 2015, DCFS contacted the maternal grandmother, who reported that she had "[no] concerns for Bella." The grandmother confirmed mother was currently enrolled in school, and that father was working. The maternal grandmother said she was "not really worried" about the father's marijuana use because she felt he used the drug "responsibly," and "not to have fun." She said father used to take pain medication for the pain in his hand, but the medication was not effective. The grandmother also said she had never smelled marijuana inside the family home, and that father was always outside when she had seen him smoking. The maternal grandmother was unsure when father normally used the drug, but explained that he "respect[ed] . . . his family and does not use it when we are there. My understanding is he does it at night when Bella is asleep." The maternal grandmother reported that she had never seen either parent intoxicated, that mother was "'a good woman'" and that father never turned "'wild or 'violent.'" The maternal grandmother also noted that she visited the family "almost [every] night[]," and would not hesitate to report improper conduct because she was "protective of the kid[]."

On July 6, approximately three weeks after the initial interviews were conducted, DCFS made an unannounced visit to the parents' home. The social worker spoke with Bella, who again appeared "well-groomed," with no visible marks. The social worker reported the child was "friendly," "healthy" and "happy." Father told the social worker he was enjoying the time he spent with his daughter, and "adjusting to family life better than he expected." Father also said that since DCFS's initial visit, he had decreased his

4

marijuana usage to "2 to 3 times per week, [whereas] before he was using almost daily." Father reported he had no difficulty reducing his intake, and had not experienced any symptoms of withdrawal. When asked where he now kept his "paraphernalia," father stated that the pipe was in a cabinet above the refrigerator. Mother reported that she had also reduced her marijuana usage to about two times per week, and showed the social worker the drops she had been using. Mother also said she and father were "communicating when the other is using so that they do not do it at the same time." Both parents discussed Bella's "inquisitive nature," and reported that she was attending preschool.

The social worker informed the parents that DCFS's "preferred plan" was to open "voluntary family maintenance" services to "monitor that they are not abusing their medical marijuana card and that one parent is functioning and sober at all times." The social worker told the parents the services would include random drug testing and enrollment in a substance abuse program. The parents stated that although they were open to the idea of services, they needed time to think about it.

That same day, the social worker spoke to a "collateral who wishe[d] to not be named." The source stated that father used to smoke inside, "but never in front of Bella," that she had also seen mother smoke, and that all of the parents' smoking now occurred outside. The source also said the parents "use[d] marijuana every day," and that father sometimes used up to "three times per day." The source reported mother was caring and careful with Bella," and that father was "building an attachment to [the child] and "attempting to bond with her." The source denied witnessing any physical abuse of Bella, or any domestic violence between the parents.

DCFS visited the parents again on July 14, 2015, at which time they reported they were doing well. Mother showed the social worker her renewed medical marijuana card. The parents indicated that although they had been "following through" with drug testing, they were no longer interested in participating in a voluntary plan. Father stated that he assumed he would not have to provide drug tests "until he [was] mandated to."

## 2. *Section 300 petition and detention*

Two weeks after the parents declined to participate in voluntary services, DCFS filed a petition alleging Bella fell within the jurisdiction of the juvenile court under Welfare and Institution Code section 300, subdivision (b).[1]  Count (b)(1) alleged mother had a "history of illicit drug use and is a daily user of marijuana which renders [her] incapable of providing regular care and supervision of the child. . . . On numerous prior occasions, the mother was under the influence of illicit drugs while the child was in the mother's care and supervision.  The child is of such a young age as to require constant care and supervision and the mother's substance abuse interferes with providing regular care and supervision of the child.  The child's father . . . knew of the mother's illicit drug use and failed to protect the child."  Count (b)(2) contained identical allegations regarding father's marijuana use, and mother's failure to protect Bella from such conduct.  Count (b)(3) alleged the parents had "created a detrimental and endangering home environment for the child in that a drug pipe and ashes from the pipe were found in the child's home within access to the child.  Such a detrimental and endangering home environment . . . endangers the child's physical health and safety. . . ."

DCFS filed a detention report in support of the petition summarizing the results of its initial investigation.  The report also contained a "prior child welfare history" indicating that father had not been the subject of any prior referrals.  Mother had three prior referrals.  In October of 2011, DCFS received a "general neglect" referral alleging she smoked marijuana in a bedroom she shared with Bella, and spent all of her time texting and checking Facebook, rather than providing care and attention to her child.  During the ensuing investigation, mother admitted "smoking marijuana once in a while, but not in the home or in the presence of the child."  Mother had said she used the drug for medical reasons, and provided a copy of her medical marijuana card.  Mother also said she had devised a plan with the maternal grandmother to act as a second caretaker for the child.  The allegation of "general neglect was [ultimately] deemed unfounded."

---

[1]     Unless otherwise noted, all further statutory citations are to the Welfare and Institutions Code.

6

DCFS received a second "general neglect" referral in August of 2012 alleging mother was wanted on an outstanding warrant for failing to pay a marijuana citation. Mother was subsequently arrested on the warrant, at which time Bella was temporarily placed with an uncle. The neglect allegation was substantiated based on the fact the child had to be placed with the uncle while mother was being detained pursuant to her arrest. DCFS received a third referral in January of 2014 alleging that "a minor informed someone that mother . . . provides the minor with methamphetamines." The allegations were "deemed inconclusive." The detention report also contained a criminal history, which showed father had no prior arrests. The report stated that mother had been arrested in 2012 for failing to pay a marijuana citation (the same arrest that gave rise to her second dependency referral), and had been convicted of misdemeanor theft in February of 2014.

In its assessment and evaluation, DCFS concluded that although there was no reason to remove Bella from the parents' home, it would nonetheless "be in the child's best interests for the family to receive services and supervision through [the agency]." DCFS explained that the "[p]arents are using medical marijuana and though they have a valid recommendation letter, [they] are not completely responsible with their use of marijuana. According to [a] collateral [source], parents continue to use daily and while the child is under their care. Also, given mother's history with DCFS, it appears that marijuana use is an ongoing issue. This and the young age of the child poses a risk for future physical and/or emotional harm." DCFS recommended that the court: (1) order a mental health assessment of the child; (2) leave the child in the parents' custody; and (3) order both parents to participate in family maintenance services, including a "substance abuse rehabilitation program with random drug and alcohol testing," parenting classes and individual counseling.

The court found DCFS had made a prima facie showing that Bella was a person described in section 300, subdivision (b), and scheduled a jurisdiction and disposition hearing for September 25, 2015. The court also followed each of DCFS's recommendations, ordering continued placement with the parents and family maintenance services.

7

### B. *Jurisdiction and Disposition*

#### 1. *Jurisdiction report*

On September 18, 2015, DCFS filed a "Jurisdiction/Disposition Report" summarizing additional interviews it had conducted with the family members. On August 19, 2015, DCFS interviewed Bella at her home. The social worker reported the child was "friendly and outgoing." Bella told the social worker she felt "safe at home other then when there is something 'spooky' under the bed when it is dark," and enjoyed watching her collection of Disney movies with her parents. According to the social worker, Bella "appeared to be a well adjusted happy child" who "did not report anything [that was] concerning."

The social worker also interviewed both parents. Father stated he and mother had "dramatically" decreased their marijuana usage "since DCFS'[s] involvement," and further indicated that mother is "not using." He also stated that when mother used the drug, she did so only as a sleep aid. He reported that he had been using the drug for approximately five years to relieve hand and back pain, and to relax. Father also stated that the paraphernalia DCFS had previously seen in the home belonged to "the former roommates," and that he had "got rid of [it]." The social worker noted that the parents had "stable housing," and that father was now employed as a security guard.

Mother informed the social worker that she had also been using marijuana for the past five years. When she used the drug, she put "drops" into a glass of water immediately before bed to help her sleep. She also said that when she or father used marijuana, somebody was always nearby, including the maternal grandmother, who lived next door. According to mother, she and father "don't ever get high knowing [the child] is awake," and never "wanted to be impaired while caring for [their] daughter." Mother stated that although she had used marijuana for the past five years, she was currently looking for "other ways to help fall asleep." She confirmed that father used marijuana for his hand and back pain, and that the parents had removed all the drug paraphernalia from the home shortly after DCFS's initial visit.

DCFS also spoke with the paternal aunt, who was renting a room in the family's residence. The aunt stated that she was in an internship to become a social worker for the Los Angeles Unified School District. The aunt said mother and father "would use [the drug] at night," but that she had never seen mother under influence of the drug. According to the aunt, mother was always "cooking, cleaning or going to school." The aunt also reported she had never witnessed the parents use the drug together, nor had she ever seen either parent use the drug in the presence of Bella. The aunt stated that she did not believe the parents abused the drug, and that she had never seen any form of paraphernalia in the house.

The jurisdiction report also listed the results of additional drug tests the parents had been scheduled to take. Following her initial test in mid-June, which showed a THC concentration level of 696 ng/ml, mother had failed to appear for tests scheduled on July 28 and August 4. On August 19, she provided a positive test that showed a THC concentration level of 197 ng/ml, which was approximately 70 percent lower than her initial test in June. Mother's most recent test on September 4, 2015 was negative. After testing positive for marijuana in June, father failed to appear for five tests scheduled between July 10 and September 10.

During a meeting with the family on August 19, the parents indicated they would comply with a "WIC 301 contract,"[2] were "open to receive" family preservation services and random drug testing and understood that their "marijuana levels need[ed] to decrease over time." Following the meeting, however, DCFS elected not to go forward with a voluntary plan given the parents' prior failure to comply with random drug testing. DCFS concluded that although the parents had "extended family support" and had been

_____

[2] Section 301 authorizes DCFS to engage in informal supervision where the social worker "determines that a child is within the jurisdiction of the juvenile court or will probably soon be within that jurisdiction." (§ 301, subd. (a).) Through the informal supervision, "the social worker shall attempt to ameliorate the situation which brings the child within, or creates the probability that the child will be within, the jurisdiction of Section 300 by providing or arranging to contract for all appropriate child welfare services. . . ." (*Ibid.*)

"cooperative" throughout the process, their refusal to participate in all of the agency's recommended services nonetheless showed that their "substance use need[ed] to be addressed in a professional setting such as a drug treatment program as they continue to use . . .[and they] need to take responsibility for their marijuana use and address this through drug counseling." DCFS expressed concern that because father had not been compliant with drug testing, the agency was unable to verify whether he had decreased his marijuana usage. DCFS also noted that because mother attended school for five hours each evening, there was a risk father was "supervising [the child] while under the influence of marijuana." DCFS recommended the court sustain the petition, and order the parents to participate in drug testing, attend AA/NA meetings and complete a family education class.

On September 25, DCFS filed a last minute information reporting that the agency had received the results of a drug test father had taken on September 14. Although the test was positive for marijuana, his THC concentration level had dropped to 127 ng/ml, approximately 70 percent lower than the level detected in his June test.

### 2. *Jurisdiction hearing*

At the September 25 jurisdiction hearing, the court announced the parties had agreed to allow the parents to continue drug testing for four additional weeks, and then reexamine whether an informal supervision contract (see § 301) would be appropriate. The court agreed to the request, but warned the parents that if they failed to comply with all of DCFS's requirements, including drug testing and attending substance abuse programming, the court would proceed to an adjudication on the section 300 petition. The court scheduled a hearing on October 30, 2015. The court ordered DCFS to file a last minute information prior to that date recommending whether the petition should be "dismissed with a contract under 301."

On October 30, 2015, DCFS submitted a last minute information stating that the parents had not yet enrolled in any drug treatment programs. Since the September 25 hearing, however, father had provided a second drug test showing a THC concentration

10

level of 113 ng/ml, which was slightly lower than the test he had provided in mid-September, and substantially lower than the test he provided in June. Mother had provided three additional drug tests: a test on September 18 showed a THC level of only 35 ng/ml, and tests on October 7 and October 13 had been negative. DCFS nonetheless recommended that the court sustain the petition, explaining: "It is crucial that mother and father address their marijuana use in order to ensure that . . . Bella is safe in their care. Additionally, given mother's history of DCFS referrals, all pertaining to alleged substance use, it appears that marijuana use is an ongoing issue for the mother. This and the young age of the child pose a risk for future physical and/or emotional harm."

At the October 30 hearing, the court announced it intended to proceed with an adjudication of the section 300 petition. Prior to hearing argument, the court informed the parties it was "inclined to make true findings and take jurisdiction and ensure that the child is being raised in a drug-free environment." Counsel for Bella argued the court should dismiss the petition because there was no evidence the parents' marijuana use had "negatively affect[ed]" the child, or otherwise placed her at any risk of harm. Counsel emphasized that although mother had missed some drug tests early in the proceedings, her recent tests showed she had now stopped using the drug.

Counsel for mother also requested that the petition be dismissed in its entirety, explaining that DCFS had made no showing that the parents' drug use placed the child at risk of harm. Counsel argued the evidence showed only that mother had previously used marijuana drops to aid her sleep, and that she had now stopped taking the drug. Moreover, father had never used the drug while the child was awake, nor was there any evidence he had actually used it while he was supervising the child. Father's counsel agreed, explaining that the reports contained no evidence Bella had been "neglected in any way, shape or form or that she [was] not being well taken care of." Father's counsel noted the paternal aunt, who lived with the family and was training to be a social worker, had never seen drug paraphernalia in the home, and had never seen the parents use the drugs together or in the child's presence.

11

DCFS, however, argued that the court should sustain the petition because the parents had repeatedly refused to participate in voluntary services. The agency also argued that the evidence in its reports suggested the parents had provided inconsistent answers regarding their drug use, and that "there [wa]s partying going on in th[e] house."

The court sustained the petition in its entirety, explaining: "[T]he child is being raised in an environment where it's not a drug-free home. Ashes from the bong and the bong were found in an area where the child could have easily reached them even though it could have been moved . . . . I appreciate that [the parents have medical marijuana] card[s,] [b]ut that doesn't mean to say that they can do it in such a way that it would be accessible to the child. . . . I agree . . . this is not a situation where it [is] sufficiently dangerous to the child where I need to remove. We can deal with this issue by keeping the child home with the parents and ensuring that the parents will do what they need to do to test and take the treatment and then we know that the child will be safe."

The court ordered the parents to provide five drug tests, and further ordered that if any tests were missed or did not come back clean, the parents would be required to participate in a "full program with weekly testing." The court also ordered the parents to attend AA/NA classes and parenting classes. The court then addressed the parents directly, stating: "You've got your baby right now. I'd like to see it end that way. But you will have to deal with these issues. And if you deal with them constructively in six months, we'll probably be over with this case and everybody will be out the door happier and better off, because you're better parents and not using drugs and not exposing your child to drugs. That's what we would all like to have happen. That's in the law. The legislature says we don't want to have children raised in drug environments. We want a drug-free environment for children to be raised in, Okay? . . . . So let's deal with these risks with the child in the home."

12

**DISCUSSION**

*A.  Summary of Governing Law and Standard of Review*

Section 300, subdivision (b) allows a child to be adjudged a dependent of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1396; *In re Rocco M*. (1991) 1 Cal.App.4th 814, 824), the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)  The court may consider past events in deciding whether a child presently needs the court's protection.  (*Ibid*.)  A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue.'  [Citation]." (*In re Christopher R*. (2014) 225 Cal.App.4th 1210, 1215–1216 (*Christopher R*.).)

In addition, the Legislature has declared:  "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child.  Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment." (§ 300.2.)

"We review the juvenile court's jurisdictional findings and disposition orders for substantial evidence.  [Citation.]  Under this standard "'[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.'  [Citations.]" (*Christopher R., supra,* 225 Cal.App.4th at p. 1216.)  ""However, substantial evidence is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not

13

be affirmed on appeal.  [Citation.]  Furthermore, '[w]hile substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]*; inferences that are the result of mere speculation or conjecture cannot support a finding* [citations].'  [Citation.]  'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.'  [Citation.]"  [Citation.]'  [Citation.]"  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763 (*Drake M.*).)

### B. The Record Contains Insufficient Evidence to Support a Finding that Either Parent Has a Substance Abuse Problem

The parents argue there was insufficient evidence to support the trial court's jurisdictional finding that they each had a "substance abuse" problem within the meaning of section 300, subdivision (b) or section 300.2.  According to parents, the evidence showed nothing more than that they used medical marijuana, which they were both licensed to do.

It is well-established that "without more, the mere usage of drugs by a parent is not a sufficient basis on which dependency jurisdiction can be found."  (*Drake M., supra,* 211 Cal.App.4th at p. 764; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 (*Destiny S.*) ["parent's use of marijuana . . . 'without more,' does not bring a minor within the jurisdiction of the dependency court"].)  As explained in *Drake M., supra*, 211 Cal.App.4th 754, the language of section 300, subdivision (b) makes clear that "jurisdiction based on 'the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse,' must necessarily include a finding that the parent at issue is a substance *abuser*."  (*Id.* at p. 764 [emphasis in original].)  This is especially true where, as here, the substance at issue is one that was legally prescribed to the parent:  "[A parent's] . . . use of medical marijuana, without more, cannot support a jurisdiction finding that such use brings the minors within the jurisdiction of the dependency court, not any more than his [or her] use of [any other] medications [legally] prescribed for him [or her] by his [physician] brings the children within the jurisdiction of

14

the court." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 453 (*Alexis E.*) [emphasis omitted].)**3**

Our courts have applied different standards to assess what constitutes "substance abuse," a term the Legislature has not defined. (See *Christopher R.,* 225 Cal.App.4th at p. 1217.) In *Drake M., supra*, 211 Cal.App.4th 754, Division Three of this District "proposed a definition . . . based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000) (DSM-IV-TR). . . . [T]he *Drake M.* court held 'a finding of substance abuse for purposes of section 300, subdivision (b), must be based on evidence sufficient to (1) show that the parent or guardian at issue had been diagnosed as having a current substance abuse problem by a medical professional or (2) establish that the parent or guardian at issue has a current substance abuse problem as defined in the DSM-IV-TR. The full definition of "substance abuse" found in the DSM-IV-TR describes the condition as "[a] maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by one (or more) of the following, occurring within a 12-month period:  [¶] (1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions, or expulsions from school; neglect of children or household)[; ¶] (2) recurrent substance use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when impaired by substance use)[; ¶] (3) recurrent substance-related legal problems (e.g., arrests for

---

**3** In addition to requiring "a finding of substance abuse," jurisdiction under section 300, subdivision (b) requires a showing that the parent "is unable to provide regular care resulting in a substantial risk of physical harm to the child." (*Drake M., supra*, 211 Cal.App.4th at p. 766.) However, when, as here, the child at issue is "six years old or younger at the time of the jurisdiction hearing – [a] child[] of 'tender years' . . . – 'the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm.' [Citation.]" (*Christopher R., supra,* 225 Cal.App.4th at p. 1219.) In this case, the parents have not challenged the "risk of harm" element, asserting only that DCFS failed to provide substantial evidence they are substance abusers, rather than merely users of medical marijuana.

15

substance-related disorderly conduct)[; and ¶] (4) continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (e.g., arguments with spouse about consequences of intoxication, physical fights)." [Citation]. [Citation.]" (*Christopher R.*, *supra*, 225 Cal.App.4th at pp. 1217 –1218.)

In *Christopher R.*, this court "recognize[d] the *Drake M.* formulation as a generally useful and workable definition of substance abuse for purposes of section 300, subdivision (b)." (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1218.)  We further held, however, that *Drake M.'s* formulation was "not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court," and rejected the assertion that "only someone who has been diagnosed by a medical professional or who falls within one of the specific DSM-IV-TR categories can be found to be a current substance abuser." (*Ibid*.)  We concluded the evidence in that particular case, however, which showed the mother had used cocaine during the late stage of her pregnancy (causing the child to test positive for the drug at birth) and that father had recently violated the terms of his probation by testing positive for marijuana, justified the exercise of jurisdiction.[4]

Regardless of which specific standard we apply, we conclude the record here does not contain substantial evidence that either parent had a substance abuse problem within the meaning of section 300, subdivision (b).  During their initial interview with DCFS, both parents informed DCFS they regularly used medicinal marijuana, and were both licensed to do so.  Father explained he had obtained a physician's recommendation to use the drug for pain in his back and his hand, and mother stated that she used diluted marijuana "drops" before going to sleep to treat her insomnia.  Both parents agreed to take a drug test, which tested negative for all drugs other than marijuana.

---

**4**    Division Eight of this District has adopted a definition derived from *Drake M.*, explaining that to support a jurisdictional finding based on substance abuse, there must be "a medical diagnosis of substance abuse" or "evidence of life-impacting effects of drug use." (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 726.)

16

In their follow-up interviews with DCFS, the parents reported they had substantially reduced their marijuana intake, and taken steps to ensure they were not simultaneously under the influence of the drug. Father reported he had reduced his marijuana intake to two to three times a week, and claimed he had not had any difficulty doing so. Mother also claimed she was now only taking the drug two times per week. The parents' subsequent drug tests supported their claim that they had substantially reduced their drug intake. Father's tests in September and October showed his THC concentration level was 68 percent and 72 percent lower than the level found in the test he took in June. Mother provided a drug test in August that showed her THC concentration level was 70 percent lower than the level found in her June test. In September she provided two additional tests: one was negative, and the other showed a THC concentration level that was 95 percent less than her initial June test. She also provided multiple negative tests in October.

DCFS's reports contain no evidence the parents had used the drug in the child's presence, nor does it contain any evidence demonstrating the parents simultaneously used the drug in a manner that rendered them incapable of caring for the child. The maternal grandmother, who checked on Bella "almost nightly," and the maternal aunt, who lived with the child, did not believe the parents were abusing the drug, nor did they believe that parents' drug use was having any negative effects on the child or on the family's life.

DCFS consistently reported that Bella appeared to be a "well-adjusted," "happy," "friendly" and "open" child who felt safe with her parents. There was no evidence either parent had engaged in any form of violence or abuse, nor was there evidence that the home environment was unstable. To the contrary, DCFS reported that the family's housing situation was "stable," that father was employed full time, that mother was attending vocational school and that Bella was attending preschool. Moreover, the maternal and paternal grandmothers were each providing additional support to the family.

Neither parent had any substantial prior criminal or child welfare history. Father had never been arrested, and had no prior involvement with the dependency court. Mother had been the subject of a "general neglect" referral involving marijuana use four

17

years earlier. During the investigation, mother admitted she occasionally used marijuana for medical reasons, and provided a medical marijuana card. The referral was deemed unfounded, meaning that the agency concluded the report was either false, inherently improbable or did not to constitute child abuse. (See Pen. Code, § 11165.12, subd. (a); *B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 192-193 & fn. 9].) The following year, mother was cited for marijuana possession, and was then arrested and detained after she failed to appear in court on the citation. Mother was released after paying the fine. Although this arrest generated a second dependency action that resulted in a substantiated finding of "general neglect," the record indicates the neglect finding was not based on mother's drug use habits, but rather because Bella had to be temporarily placed with a family member during the brief period mother was detained pursuant to her arrest. A more recent referral involving an allegation that a "minor had told someone" mother gave him methamphetamine was deemed inconclusive, meaning that there was insufficient evidence to determine what had occurred. (See Pen. Code, § 11165.12, subd. (c).) Thus, while mother's history does indicate she was the subject of two prior legal proceedings involving marijuana use, neither proceeding was recent (see *Destiny S., supra*, 210 Cal.App.4th at p. 1004 [conduct described in investigation that occurred many years ago not relevant to current risk assessment], and neither resulted in a finding of substance abuse.

In sum, the evidence shows that: (1) both parents possessed a valid medical marijuana card; (2) after their initial meeting with DCFS, the parents agreed to reduce their marijuana intake and take precautions to ensure they did not take the drug at the same time; (3) the parents' drug tests indicated they had in fact substantially reduced their drug intake; (4) the parents did not use the drug in the child's presence; (5) there was never any professional diagnosis of substance abuse; (6) the parents have met the child's basic needs, and provided a stable home environment; (7) Bella is a happy, well-adjusted child who feels safe with her parents; (8) other family members who had daily contact with the family had no concerns regarding the child or the parents' drug use; and (9)

18

neither parent has a substantial criminal history or any prior substantiated finding of substance abuse.

These facts distinguish this case from other decisions that have affirmed a jurisdictional finding predicated on substance abuse. In *Christopher R.*, *supra*, 225 Cal.App.4th 1210, for example, we affirmed a finding of substance abuse where the evidence showed the parent had used marijuana daily since the age of 14; had steadily increased his intake of the drug; had never obtained a medical marijuana card; and had recently violated the terms of his parole by failing to complete a substance abuse program and testing positive for marijuana. (*Id.* at pp. 1213-1214, 1219-1220.) In *Alexis R.*, *supra*, 171 Cal.App.4th 438, Division Three of this District affirmed a finding of substance abuse based on evidence showing that the father "constantly" smoked marijuana in the presence of his children, that his drug use had a "negative effect on his demeanor towards his children and others," which included neglectful behavior and violent outbursts and had admitted he could "not function" without the drug. (*Id.* at pp. 451-453.) In *Rebecca C., supra*, 228 Cal.App.4th 720, Division Eight of this court affirmed a jurisdiction finding based on substance abuse where the evidence showed mother had tested positive for methamphetamine, amphetamine and marijuana after specifically denying any current use of drugs. She later admitted she had a substance abuse problem, had several prior criminal convictions involving drug use, and had been the subject of a prior dependency proceeding that resulted in a finding of drug abuse. (*Id.* at pp. 722-723, 726-727.)

In contrast, the parents here never denied their marijuana use, both held valid medical marijuana cards and were both able to substantially reduce their drug intake immediately after DCFS became involved. Moreover, there was no evidence the parents' drug use had interfered with their major life obligations, or negatively affected their relationships with each other, the child or anyone else. The facts of this case are therefore analogous to *Drake M.*, *supra*, 211 Cal.App.4th 754, in which the court reversed a jurisdictional finding based on father's marijuana use. The father in *Drake M.* admitted he regularly used medical marijuana to treat arthritis, and had done so for years.

The evidence showed, however, that father had a steady job, provided for the child's basic needs, remained sober in the child's presence and had no significant legal, social, or personal problems caused by his drug use. The court concluded such evidence was not sufficient to show "father ha[d] a substance abuse problem." (See *In re Drake M., supra*, 211 Cal.App.4th at pp. 766-768.) The same is true here.

DCFS, however, contends that three categories of evidence support the court's finding that the parents did in fact have a substance abuse problem. First, DCFS argues the record shows the parents refused to participate in voluntary drug treatment prior to the jurisdiction hearing. According to DCFS, this conduct demonstrates the parents were not "serious about addressing their substance abuse issues, thereby prolonging their substance-related legal problems." DCFS's reasoning is circular, positing that the parents' decision not to accept services for a condition they contend DCFS has otherwise failed to prove (substance abuse) is itself evidence of the condition. In the absence of independent evidence establishing that the parents did in fact have a substance abuse problem, we fail to see how their decision to decline DCFS's request for voluntary services is, in itself, evidence of such a problem.

Second, DCFS argues the juvenile court's finding of substance abuse is supported by evidence showing the parents "were less than forthright about the continuing nature and extent of their marijuana use." More specifically, DCFS asserts that although the parents told the agency they had substantially reduced their marijuana intake during an interview on July 6, 2015 (which was three weeks after their initial interview), other evidence in the record shows the parents had in fact "continued to use marijuana on a daily basis [even] after DCFS [first] became involved with the family." DCFS's brief does not describe what specific evidence proves the parents misrepresented that they were no longer using marijuana on a daily basis. The brief contains a citation to a portion of the detention report that summarizes an interview the agency conducted with an unnamed "collateral source" on July 6, 2015. The report states the unnamed source had claimed the parents "used marijuana every day," and that father sometimes used the drug up to three times a day. DCFS appears to posit this statement constitutes substantial

20

evidence that parents were being untruthful when they told DCFS in July that they had reduced their marijuana usage.

The collateral source's statement regarding the frequency of parents' drug use does not, however, identify what specific time period the speaker was referring to. In their June meeting with DCFS, the parents did not deny daily usage of the drug. It was not until their subsequent interviews in July and August that the parents claimed to have reduced their marijuana usage to two times per week. The parents' claims are supported by the results of their subsequent drug tests in August, September and October, which showed significant reductions in their respective THC levels. The collateral source, in turn, did not state that the parents continued to use drugs daily even after their initial meeting with DCFS. Rather, the source stated only that parents used the drug daily. Without any information clarifying the specific time period to which the speaker was referring, this isolated, anonymous statement is not sufficient to show the parents were being untruthful about the changes in their drug use.

Third, DCFS argues there is substantial evidence that after the agency interviewed the parents in June, they continued to use marijuana together each night, suggesting they were simultaneously "impaired" while Bella was under their supervision. The sole evidence DCFS relies on in support of this assertion is the paternal aunt's statement during an interview on September 25 that the parents "would use at night." The paternal aunt did not, however, state that the parents both used the drug every night, or that they used the drug at the same time. To the contrary, the aunt specifically clarified that she had never seen mother "under the influence," and had never seen the parents "use together or in front of Bella." Considered as a whole, the only inference that can be reasonably drawn from the aunt's comment is that when the parents did use marijuana, they did so only at night.[5]

---

[5]    Throughout its brief, DCFS also relies on information provided in the referral that precipitated the agency's investigation. Specifically, DCFS relies on statements in the referral alleging there were other people in the home smoking marijuana, that the odor of marijuana extended from the house to the street, and that the child was present when

At the adjudication hearing, the juvenile court appeared to base its jurisdictional finding on a fourth category of evidence: DCFS's observation of a marijuana pipe and ashes in an area accessible to the child during the agency's first visit to the home. In sustaining the petition, the court said: "All right. The court will find the . . . counts true as plead. The risk that the child is being raised in an environment where it's not a drug free home. Ashes from the bong and the bong were found in an area where the child could have easily reached them even though it could have been moved. . . . It would [not] be ok if you were to be a user . . . of . . . alcohol or something . . . and left open bottles or half-drunk glasses . . . of alcohol where a child could find their way to that . . . ." The court later emphasized the Legislature had directed that children should not be "raised in drug environments. We want a drug-free environment for children to be raised. . . . It's no different than if you left a . . . bottle of wine on the coffee table in the living room and the child drank it all."[6]

To the extent the juvenile court concluded that, regardless of whether the parents were substance abusers, the act of leaving the pipe and ashes in an area accessible to Bella on a single occasion demonstrated they had placed the child at risk of harm by failing to adequately supervise her (see § 300, subd. (b) [permitting jurisdiction where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child]), the record does not support that finding. There is no evidence the parents ever left Bella unattended in the presence of these items. Moreover, after DCFS informed father that the paraphernalia was potentially

marijuana was being smoked. DCFS, however, presented no evidence substantiating these allegations.

[6]     The court's statement that the Legislature has directed children should be raised in a "drug-free environment" appears to be a reference to section 300.2, which states: "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." As discussed above, however, use and abuse are not interchangeable terms.

hazardous to the child, father immediately placed the items in a secure location, and later removed them from the home. During subsequent visits to the house, at least one of which was unannounced, DCFS reported that father had secured the pipe in a cabinet above the refrigerator, and later removed the item from the house. We do not believe father's act of leaving a pipe and marijuana ashes in an area accessible to the child on a single occasion is itself substantial evidence that the parents had placed the child at substantial risk of serious physical harm or illness.

In sum, under the circumstances presented here, we conclude the juvenile court's order declaring the child a dependent of the court pursuant to section 300, subdivision (b) is not supported by substantial evidence.[7]

## DISPOSITION

The juvenile court's jurisdictional findings and disposition order are reversed.

ZELON, J.

We concur:

PERLUSS, P. J.

SEGAL, J.

---

[7]    During the jurisdictional hearing, the court stated that it had declared the child a dependent pursuant to section 300, subdivisions "(a) through (j)." The parties agree that, in light of the fact the petition alleged jurisdiction only under subdivision (b), the court's oral references to the other subdivisions in section 300 was error. We agree that the record clearly demonstrates that to be the case, and that the minute order failed to accurately record the court's erroneous ruling.